34 So.3d 1281 (2009)
A.C.
v.
C.C.
2080625.
Court of Civil Appeals of Alabama.
October 9, 2009.
*1282 Derek E. Yarbrough of Motley, Motley & Yarbrough, LLC, Dothan, for appellant.
Joel M. Nomberg of Nomberg & Maddox, P.C., Dothan, for appellee.
THOMAS, Judge.
A.C. ("the mother") appeals from an order of the Houston Juvenile Court determining that her six-year-old daughter, L.C. ("the child"), is dependent and awarding custody to C.C., the child's maternal grandmother ("the grandmother"). We dismiss the appeal because it is taken from a nonfinal judgment.
At the time of the child's birth in 2003, the mother was 18 years old. The mother, the grandmother, and D.C., the child's maternal grandfather (from whom the grandmother was later divorced) were all residents of Louisiana. When the child was 11 months old, the mother voluntarily relinquished custody of the child to the grandmother. On August 3, 2004, the District Court of Livingston Parish, Louisiana, awarded custody of the child to the grandmother for a three-year period ending August 1, 2007. Soon after the Louisiana court entered that judgment, the mother left Louisiana. In May 2006, the grandmother *1283 and the child moved to Dothan, Alabama.
On April 26, 2007, the grandmother filed in the Houston Juvenile Court a petition alleging that she had had legal custody of the child since August 3, 2004, pursuant to a Louisiana judgment, a copy of which she attached to her petition. The grandmother further alleged that the mother was aware that, under the terms of that judgment, the grandmother's custody rights were due to expire on August 1, 2007, and that the mother might "have plans to attempt to take the child at that time"; that the mother was unstable and unfit to have custody of the child because she had a history of drug abuse; that the mother had not seen the child since January 5, 2006, had not telephoned the child since April 21, 2007, and had not provided support for the child; that the mother was currently a resident of Alaska; that the whereabouts of the man believed to be the child's biological father were unknown; and that it was in the child's best interest to remain in the custody of the grandmother. On the day the petition was filed, the juvenile court entered an order awarding the grandmother pendente lite custody of the child.
On June 28, 2007, the mother answered the grandmother's petition, filed a counterpetition for custody of the child, and requested that the court order a home study of her residence in Alaska. The mother acknowledged that she had voluntarily relinquished custody of the child in 2004; she asserted that she and the grandmother had agreed that the child would be in the grandmother's temporary custody for three years so that the mother "could become drug free and stable in her life." The mother further alleged that she had "cleaned up her life, [was] gainfully employed working four jobs, [had] a stable home, and [was] ready, willing, and able to abide by the agreement she made three years ago"; that her alleged failure to have kept in touch with the child was due to the grandmother's denial of contact and the great distance between Alabama and Alaska; and that the grandmother's assertions as to the mother's unfitness were based upon "events that led up to the August 3, 2004 agreement and are not otherwise supported by any factual basis." On July 24, 2007, the juvenile court entered an order continuing pendente lite custody with the grandmother, directing the Houston County Department of Human Resources ("DHR"), via its counterpart in Alaska, to conduct a home study of the mother's residence, and allowing the mother biweekly telephone contact and supervised visitation with the child.
In December 2007, the mother and her younger daughter, M.J., who had been born in October 2006, moved to Dothan so that the mother could attempt to establish a relationship with the child. The mother secured a job as an apprentice electrician at the Farley Nuclear Power Plant and began work in January 2008. She obtained an apartment in Dothan and made day-care arrangements for her younger daughter, M.J. The mother and the grandmother had disagreements over the amount and type of visitation that the mother should have with the child, and, on January 24, 2008, the juvenile court ordered specific times for the mother's visitation with the child, stating that the parties were entering "a transitional phase toward reunification" of the mother with the child. The court directed that the visits be supervised by Dr. Lynn Suggs, a licensed professional counselor.
On February 8, 2008, the mother filed a contempt motion, alleging that the grandmother had refused to allow the mother to visit the child with Dr. Suggs present. The juvenile court entered an order on *1284 February 14, 2008, continuing a hearing on the contempt motion to March 27, 2008.
On February 21, 2008, the grandmother moved to strike the mother's contempt motion and moved the court to order that the mother have an independent psychological evaluation. On March 4, 2008, the mother filed an objection to the grandmother's motion that she have a psychological evaluation, asserting that the parties had agreed to carry out a reunification plan and that the grandmother was reneging on the agreement, because, the mother alleged, all the grounds listed in the grandmother's motion predated the parties' agreement to work towards reunification. On March 27, 2008, the juvenile court ordered both the mother and the grandmother to undergo psychological evaluations. The court did not rule on the mother's February 8, 2008, contempt motion.
On April 17, 2008, the juvenile court granted the mother weekend daytime visitation rights. On April 23, 2008, the grandmother moved the court to issue a temporary restraining order to prevent the mother from taking the child out of State. On May 6, 2008, the mother moved for overnight visitation, attaching to her motion a copy of her psychological evaluation conducted by a clinical psychologist, Dr. Melanie Cotter. On May 8, 2008, the juvenile court referee ordered the mother not to remove the child from the jurisdiction of the court pending further orders, and the referee set a hearing on all other pending motions for June 26, 2008. On May 16, 2008, the grandmother objected to the mother's having overnight visitation with the child, alleging that the child's safety was at risk because the mother had previously accused her father, D.C., of sexual abuse, and yet had allowed D.C. to visit her and to stay overnight in her home since she had moved to Dothan. On June 3, 2008, the grandmother moved the court to hold the mother in contempt for taking the child out of state to Dr. Suggs's home in Georgia. On June 4, 2008, the mother moved the court to hold the grandmother in contempt for denying her visitation with the child. Following a hearing on June 26, 2008, the juvenile court granted the mother overnight visitation with the child on alternating weekends and ordered that the child have no contact with D.C. The record does not indicate that the court ruled on any of the three pending contempt motions.
On July 8, 2008, D.C., who was still a resident of Louisiana, moved to intervene, seeking grandparent visitation with the child. The same day, the grandmother moved the court to order the mother to pay child support pursuant to Rule 32, Ala. R. Jud. Admin. On September 12, 2008, the mother filed a second petition for custody of the child and moved the court to consolidate a hearing on her petition with the hearing on the grandmother's request for child support.[1]
On September 29, 2008, the mother moved for an emergency hearing on her custody petition, asserting that the grandmother's "bizarre and delusional" behavior had put the child at risk of serious injury. The mother alleged, among other things, that the grandmother had participated with K.C., the child's maternal aunt, in distributing an "Amber Alert" e-mail message, falsely reporting that the mother's younger daughter, M.J., had been abused and neglected and was missing. The mother also alleged that the grandmother had falsely reported to DHR that the child had been sexually abused by the mother and D.C. Following a hearing on September *1285 30, 2008, the juvenile court ordered DHR to report to the court its finding with respect to the sexual-abuse complaint. It also ruled that the mother's overnight weekend visitation would continue pending further orders of the court. On October 1, 2008, the grandmother petitioned for custody of M.J., asserting that M.J. was dependent. On October 3, 2008, the mother left Dothan, rented a mobile home near D.C.'s home in Louisiana, and filed a custody petition in a Louisiana court, seeking legal custody of M.J.
The trial of all issues raised by the pleadings, including the grandmother's dependency and custody petition with respect to M.J.,[2] occurred on January 20, 2009. The juvenile court granted D.C.'s motion to intervene, and it noted that there were "various contempt motions" before the court. The record does not indicate that the juvenile court ever ruled on the mother's February 2, 2008, or June 4, 2008, contempt motions, or on the grandmother's June 3, 2008, contempt motion. In addition, the case-action-summary sheet indicates that on January 16, 2009, there was a "second motion for contempt." The record before us contains no filing by either party on January 16, 2009.
On March 24, 2009, the juvenile court entered the following findings of fact and conclusions of law:
"[The mother] voluntarily relinquished custody of [the child] to [the grandmother] on August 3, 2004, in the State of Louisiana. [The child] was approximately eleven months old at this time. This transfer of custody was approved by the Louisiana court, which ordered that [the grandmother] would retain custody of [the child] for a period of three years. [The child] has since resided with [the grandmother] for over five years. [The grandmother and the child moved to Houston County, Alabama, in May 2006].
"The evidence at trial established that the primary reason for the transfer of [the child's] custody from [the mother] to [the grandmother] was [the mother's] drug use and lack of stability. Subsequent to relinquishing custody of [the child], [the mother left Louisiana and] traveled to various states and for approximately one yearmost of 2006 [the mother's] whereabouts were unknown. During the three years following the Louisiana order, [the mother] had little contact with [the child] and provided no support on her behalf.
"At trial, [the mother] attempted to prove that she had attained a stable lifestyle and that she is no longer using drugs, as evidenced by negative drug screens for the past two and one-half years. She testified that she moved to Dothan and worked for some time here as an electrician's apprentice, earning $11.33 per hour at the nuclear plant. However, by the time of the hearing, she had moved to Louisiana to get better work and to be near her father. [The mother] presented testimony from a DHR social worker who testified that she had no concerns with [the child's] custody being returned to [the mother]. [The mother] also called as a witness Dr. Lynn Suggs, a licensed professional counselor, who testified as to [the mother's] efforts to establish a relationship with [the child].
"[The grandmother] disputed and discounted [the mother's] attempts to rehabilitate *1286 herself and testified that [the mother] had not successfully established a mother-daughter relationship with [the child]. [The grandmother] also presented the testimony of Dr. David Ghostley, a psychologist who had evaluated [the mother and the child]. Dr. Ghostley testified that the results of [the mother's] MMPI [Minnesota Multiphasic Personality Inventory] were not valid due to an elevation on the `lie scale,' a built-in mechanism within the MMPI used to determine whether persons taking that inventory are providing truthful responses. Dr. Ghostley also testified that it would not be in [the child's] best interests to be removed from the custody of [the grandmother] at this time. [The grandmother] also questioned the credibility of the testimony presented by Dr. Suggs and attempted to show by cross-examination of Dr. Suggs that [the mother] and Dr. Suggs had developed a personal relationship, as demonstrated in part by the fact that Dr. Suggs and her husband had traveled to Alaska, at [the mother's] expense, when Dr. Suggs first met [the mother] to assist her in this case.
"During the course of the trial, [the child's] father also testified. Due to his extremely limited contact with [the child] and his failure to show interest in maintaining a relationship with [the child], the court finds that he is not a suitable person to have custody of [the child] and that there is no reason to believe that he is able or willing to support or nurture [the child] or provide for her welfare at this time.
". . . [The child's] case presents serious and difficult issues. On one hand, [the mother] has made efforts at rehabilitation and has demonstrated an interest in parenting [the child]. On the other hand, the court cannot turn a blind eye to the tragic facts and circumstances for which [the mother] is responsible which have created the difficulties involving [the child's] custody. Ultimately, the issue this court must address is whether the relatively recent emergence of [the mother] as an interested parent is sufficient to prevent a finding of dependency. Upon consideration of the evidence and testimony in this case, the court decides this issue adversely to [the mother] and does find by clear and convincing evidence that [the child] is a dependent child.
"Based on the finding of dependency as to [the child], the court orders that custody of [the child] shall remain at this time with [the grandmother], the Petitioner, subject to the following rights of visitation by [the mother]:
"1) Every other weekend from 5:00 p.m. on Friday until 5:00 p.m. the following Sunday;
"2) For one-half of all school breaks, with the exception of the summer break, as determined by the school calendar of the school district where the child resides;
"3) For ten consecutive days during the summer break.
"All visitation shall be exercised no more than 100 miles from the city of Dothan, Alabama. During any such visitation, the child shall be allowed to have contact with her maternal grandfather, [D.C.]. However, the request of [D.C.] for rights of specific visitation is denied. At all such times as [the mother] shall exercise visitation, she shall provide to [the grandmother] notice of where the visitation will take place."
Although neither party has raised the issue of this court's jurisdiction to entertain this appeal, this court must first determine whether it has jurisdiction over this appeal. "Jurisdictional matters *1287 are of such importance that a court may take notice of them ex mero motu." McMurphy v. East Bay Clothiers, 892 So.2d 395, 397 (Ala.Civ.App.2004). "An appeal ordinarily will lie only from a final judgmenti.e., one that conclusively determines the issues before the court and ascertains and declares the rights of the parties involved." Bean v. Craig, 557 So.2d 1249, 1253 (Ala.1990). "[T]he question whether a judgment is final is a jurisdictional question." Johnson v. Johnson, 835 So.2d 1032, 1034 (Ala.Civ.App.2002), overruled on other grounds, Eustace v. Browning, 30 So.3d 445 (Ala.Civ.App. 2009). The pendency of an unadjudicated contempt motion alleging a party's failure to obey orders entered during the progress of the litigation renders a judgment nonfinal. See Decker v. Decker, 984 So.2d 1216 (Ala.Civ.App.2007); Heaston v. Nabors, 889 So.2d 588 (Ala.Civ.App.2004).
The pendency of three, and possibly four, unadjudicated contempt motions made during the contentious 21-month period before this case was tried renders the juvenile court's March 24, 2009, order nonfinal. We find nothing in the juvenile court's March 24, 2009, order that constitutes an implicit ruling on any of the contempt motions. Accordingly, we must dismiss the appeal.
APPEAL DISMISSED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
NOTES
[1] On December 5, 2008, in a different case, a child-support order was entered directing the mother to pay the grandmother $318 per month for the support of the child.
[2] The grandmother's dependency petition with respect to M.J. was assigned a separate case number; however, the court consolidated it for trial with the dependency petition regarding the child. No issue with respect to the alleged dependency or custody of M.J. is presented on this appeal.